IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WHITESTAR DISTRIBUTORS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:20-cv-970-K-BN |
| | § | |
| KENNETH T. CUCCINELLI, Senior | § | |
| Official Performing the Duties of the | § | |
| Director, U.S. Citizenship and | § | |
| Immigration Services, AND | § | |
| GREGORY A. RICHARDSON, | § | |
| Director of Texas Service Center | § | |
| | § | |
| Defendants, | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and a standing order of reference from United States District Judge Ed Kinkeade. *See* Dkt. No. 5.

Plaintiff Whitestar Distributors, Inc. petitioned for a permanent resident visa on behalf of beneficiary Morad Talal Kamal on the basis that, for immigration-classification purposes, Mr. Kamal is an immigrant multinational executive or manager. U.S. Citizenship and Immigration Services ("USCIS") denied the petition.

Whitestar now seeks judicial review of the agency's decision under the Administrative Procedures Act ("APA). The parties have filed cross motions for summary judgment and corresponding responses and replies. *See* Dkt. Nos. 16-25.

1

For the following reasons, and as explained below, the Court should deny Plaintiff's Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

## Background

Whitestar is a Texas corporation with its headquarters in Dallas, Texas. *See* Dkt. No. 1 at 4; Dkt. No. 14-12 at 43 (Administrative Record ("AR") at 1148). Beginning in 2012, Whitestar, on behalf of Morad Talal Kamal, filed a series of Petitions for a Nonimmigrant Worker (Form I-129), seeking an L-1A visa–an intra-company visa for a petitioner's alien-employee to remain in the United States temporarily. USCIS approved each Form I-129 petition, and Mr. Kamal was issued L-1A visas valid from January 11, 2013 to January 10, 2020. *See* Dkt. No. 1-1; Dkt. No. 14-18 at 73-80 (AR at 1578-85).

On August 15, 2016, Whitestar filed an Immigrant Petition for Alien Worker (Form I-140), asserting that it was hiring Mr. Kamal as General Manager and would employ him permanently in the United States. Whitestar sought to classify Mr. Kamal as a multinational executive or manager. *See* Dkt. No. 14-2 at 54-59 (AR at 154-59).

On January 24, 2017, USCIS issued a Request for Evidence ("RFE") regarding Kamal's qualifying employment both abroad and in the United States. *See* Dkt. No. 14-8 at 74-76 (AR at 765-67). Whitestar filed a response. *See id.* at 82-86.

USCIS denied the I-140 petition on August 30, 2017. *See* Dkt. No. 14-1 at 31-34 (AR at 30-33). USCIS determined that the evidence was insufficient to establish

that Mr. Kamal was employed for at least one year in a managerial or executive capacity with a qualifying foreign organization or that Mr. Kamal has been or will be employed in a managerial capacity in the United States. *See id.*

Whitestar filed a Motion to Reconsider on September 29, 2017. *See* Dkt. No. 14-8 at 10 to 14-9 at 106 (AR at 697-894 (Form I-290B)). USCIS dismissed the motion two years later, on October 30, 2019. *See* Dkt. No. 14-8 at 3-5 (AR at 694-696).

Whitestar sought judicial review of the denial of the I-140 petition and filed a previous lawsuit in this court on December 18, 2019. *See Whitestar Distrib., Inc. v. Cuccinelli,* No. 3:19-cv-2985-C (N.D. Tex. 2019). In response, on February 27, 2020, USCIS reopened the I-140 petition proceeding and issued a Notice of Intent to Deny ("NOID") to afford Whitestar another opportunity to overcome the evidentiary deficiencies in the record. *See* Dkt. No. 14-1 at 15-28 (AR at 14-27). In the NOID, USCIS explained that the evidence was insufficient to establish a qualifying corporate relationship with a foreign entity or that Mr. Kamal worked in a qualifying managerial capacity in the United States and overseas. *See id.* Whitestar filed a response on March 2, 2020. *See* Dkt. No. 14-4 at 18-44 (AR at 313-39).

USCIS dismissed the I-140 petition on April 3, 2020 for three reasons: Whitestar failed to establish that (1) it has a qualifying relationship with the foreign entity – The Modern Establishment (Smadi) for Agricultural Supplement ("Smadi"); (2) Mr. Kamal had been employed in the proper capacity by Smadi in Palestine; and (3) Mr. Kamal will be working for Whitestar in the United States in a qualifying multinational managerial or executive capacity. *See* Dkt. No. 14-1 at 13 (AR 12).

Whitestar now seeks judicial review of the April 30, 2020 Decision. *See* Dkt. No. 1. The parties have filed cross-motions for summary judgment. *See* Dkt. Nos. 1, 16, 18. Whitestar seeks a court order declaring the Decision unlawful and directing Defendants to approve the Petition. The Defendants move the court to affirm the Decision.

The sole issue before the Court is whether USCIS's denial of the I-140 petition was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## Legal Standards

### I.  Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual "issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003). "A factual dispute is 'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

If the moving party seeks summary judgment as to his opponent's claims or defenses, "[t]he moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625

(5th Cir. 1998). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (internal quotation marks and footnote omitted).

"Once the moving party meets this burden, the nonmoving party must set forth" – and submit evidence of – "specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings." *Lynch Props.*, 140 F.3d at 625; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *accord Pioneer Expl.*, 767 F.3d at 511 ("[T]he nonmovant cannot rely on the allegations in the pleadings alone" but rather "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." (internal quotation marks and footnotes omitted)).

The Court is required to consider all evidence and view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party and resolve all disputed factual controversies in favor of the nonmoving party – but only if the summary judgment evidence shows that an actual controversy exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Pioneer Expl.*, 767 F.3d at 511; *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *Lynch Props.*, 140 F.3d at 625. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor. While the court must disregard evidence favorable to the moving party that the jury is not required to believe, it gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 942-43 (5th Cir. 2015) (internal quotation marks and footnotes omitted). And "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden, *Little*, 37 F.3d at 1075; *accord Pioneer Expl.*, 767 F.3d at 511 ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." (internal quotation marks and footnote omitted)). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted).

Rather, the non-moving party must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

And "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Pioneer Expl.*, 767 F.3d at 511 (internal quotation marks and footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott*, 550 U.S. at 380 (internal quotation marks and emphasis omitted). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

7

"After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *DIRECTV, Inc. v. Minor*, 420 F.3d 546, 549 (5th Cir. 2005) (footnote and internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted).

The Court will not assume "in the absence of any proof ... that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment," and "[a] failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (internal quotation marks omitted).

If, on the other hand, "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). The "beyond peradventure" standard imposes a "heavy" burden. *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-cv-1866-D, 2007 WL

2403656, at *10 (N.D. Tex. Aug. 23, 2007). The moving party must demonstrate that there are no genuine and material fact disputes and that the party is entitled to summary judgment as a matter of law. *See, e.g.*, *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). On such a motion, the Court will, again, "draw all reasonable inferences in favor of the non-moving party." *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

"When parties file cross-motions for summary judgment, [the Court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5t h Cir. 2013) (footnote and internal quotation marks omitted).

## II.    Review of Agency Determinations Under the APA

When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. *See, e.g.*, *Redeemed Christian Church of God v. United States Citizenship & Immigration Servs.*, 331 F. Supp. 3d 684, 694 (S.D. Tex. 2018). The entire case on review is a question of law. *See id.* "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (internal quotation marks omitted). "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Am. Stewards of Liberty v. United States Dep't of*

*Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019) (internal quotation marks omitted).

An applicant for a visa bears the burden of establishing eligibility by a preponderance of the evidence. *See Nat'l Hand Tool Corp. v. Pasquarell*, 889 F.2d 1472, 1475 (5th Cir. 1989). A denial of an application for a visa may be reversed by the court only if the USCIS decision is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *see also Defensor v. Meissner*, 201 F.3d 384, 386 (5th Cir. 2000). "Although a reviewing court is bound to ensure that the [USCIS] engaged in 'reasoned decision-making' in denying an application, the [USCIS] is entitled to considerable deference in its interpretation of the governing statute." *Nat'l Hand Tool Corp.*, 889 F.2d at 1475 (citations omitted). Deference is particularly appropriate in immigration matters, which are a "sovereign prerogative" of the executive and legislative branches of government. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

The Court may not substitute its own judgment for that of USCIS. *See City of Abilene v. United States Envtl. Prot. Agency*, 325 F.3d 657, 664 (5th Cir. 2003). The Court may only consider "whether the [USCIS] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989); *accord Delta Found. Inc. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002). The Court "does not reweigh the evidence." *Delta Talent, LLC v. Wolf*, 448 F. Supp. 3d 644, 650 (W.D. Tex. 2020). "Thus, if the agency considers the factors and articulates a rational relationship

between the facts and the choice made, its decision is not arbitrary and capricious." *Delta*, 303 F.3d at 563.

## Analysis

I.    Denial of a permanent immigrant visa after previous grants of temporary nonimmigrant visas does not violate the APA.

As an initial matter, Whitestar contends that USCIS's denial of the Form I-140 Petition was arbitrary and capricious because USCIS had accepted the same evidence to support a qualifying relationship when it granted the I-129 petitions and it did not include the failure to establish a qualifying relationship in the RFE, but instead raised it for the first time in the NOID.

Although similar, the statutory and regulatory requirements differ between the immigrant and nonimmigrant visas. Each petition is separate and independent, and USCIS must adjudicate each on its own merit. See *Delta Talent*, 448 F. Supp. 3d at 653. "The fact that a beneficiary was previously deemed eligible as an L-1A nonimmigrant visa does not automatically establish the beneficiary's eligibility as an immigrant." *Id.* As another court in this circuit has noted, "the benefits of an immigrant visa–permanent residence–are distinct from those provided by a nonimmigrant visa–only temporary residence," and "[a] decision to deny an I-140 petition, despite the earlier grant of an L-1A visa, does not violate the APA." *Id.*; see 8 U.S.C. § 1361 ("Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or document."); *see also Noble House*,

11

*Inc. v. Wiles*, No. 12-cv-7816, 2013 WL 1164093, at *7 (C.D. Cal. Mar. 19, 2013) ("The benefits associated with the granting of an I–140 petition–permanent residence—are sufficiently distinct from the status provided by a L–1A visa– temporary non-immigrant status–that the results of USCIS's analysis of an I–140 petition need not automatically mimic the conclusion USCIS reached when it approved an L–1A visa application even if the definitions of "executive capacity" and "managerial capacity" are identical for both L–1A visas and I–140 petitions.").

Thus, USCIS's denial of the I-140 petition based on the failure to establish a qualifying relationship was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law even though the USCIS previously accepted the evidence initially submitted in support of the I-140 petition when it granted the I-129 petitions.

But, even if USCIS erred by not raising the failure to establish a qualifying relationship issue earlier, "USCIS is not bound by a prior finding that is later determined to be erroneous." *Doe v. USCIS*, 410 F. Supp. 3d 86, 99 (D.D.C. 2019); *see also Sussex Eng'r, Ltd v. Montgomery*, 825 F2d 1084, 1090 (6th Cir. 1987) ("It is absurd to suggest that [USCIS] ... must treat acknowledged errors as binding precedent.").

When an agency departs from a prior decision, it is required to provide a reasoned explanation. *See Doe*, 410 F. Supp. 3d at 99 (citing *F.C.C. v. Fox Television Stations*, 556 U.S 502, 514-16 (2009)). And, as discussed below, USCIS has done so.

II.    USCIS did not err by denying the I-140 Petition on the basis that Whitestar <u>failed to establish a qualifying relationship.</u>

USCIS denied the Form I-140A petition because Whitestar did not establish a qualifying relationship with the foreign entity, Smadi. USCIS determined that "the record does not establish that the petitioner and the beneficiary's claimed foreign employer are owned and controlled by the same entity, or the same individual, or the same group of individuals." Dkt. No. 14-1 at 6, 14 (AR at 5, 13).

To qualify for a multinational executive or manager visa classification, Whitestar must establish that it has a qualifying relationship with the foreign entity:

> *Certain multinational executives and managers.* An alien is described in this subparagraph if the alien, in the 3 years preceding the time of the alien's application for classification and admission into the United States under this subparagraph, has been employed for at least 1 year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and the alien seeks to enter the United States in order to continue to render services to the same employer or to a subsidiary or affiliate thereof in a capacity that is managerial or executive.

8 U.S.C. § 1153(b)(1)(C).

A Form I-140 petition for a multinational executive or manager must be accompanied by a statement from an authorized official of the petitioning United States employer which demonstrates that the prospective employer in the United States is the same employer or a subsidiary or affiliate of the firm or corporation or other legal entity by which the alien was employed overseas. *See* 8 C.F.R. § 204.5(j)(3)(i)(C). Thus, to establish a "qualifying relationship," the petitioner must show that the beneficiary's foreign employer and the petitioner are the same employer (i.e., a U.S. entity with a foreign office) or related as a "parent and subsidiary" or as "affiliates." *Id.*

For these purposes, an "affiliate" is:

(A) One of two subsidiaries both of which are owned and controlled by the same parent or individual;
(B) One of two legal entities owned and controlled by the same group of individuals, each individual owning and controlling approximately the same share or proportion of each entity; or
(C) In the case of a partnership that is organized in the United States to provide accounting services, along with managerial and/or consulting services, and markets its accounting services under an internationally recognized name under an agreement with a worldwide coordinating organization that is owned and controlled by the member accounting firms, a partnership (or similar organization) that is organized outside the United States to provide accounting' services shall be considered to be an affiliate of the United States partnership if it markets its accounting services under the same internationally recognized name under the agreement with the worldwide coordinating organization of which the United States partnership is also a member.

8 C.F.R. § 204.5(j)(2). And a "subsidiary"

means a firm, corporation, or other legal entity of which a parent owns, directly or indirectly, more than half of the entity and controls the entity; or owns, directly or indirectly, half of the entity and controls the entity; or owns, directly or indirectly, 50 percent of a 50–50 joint venture and has equal control and veto power over the entity; or owns, directly or indirectly, less than half of the entity, but in fact controls the entity.

*Id.* "Parent means a firm, corporation, or other legal entity which has subsidiaries."

8 C.F.R. § 214.2(l)(ii)(L).

Ownership and control are factors that must be examined in determining whether a qualifying relationship exists between United States and foreign entities. *See Matter of Church Scientology Int'l*, 191 I. & N. Dec. at 595 (Comm'r 1986); *Matter of Siemens Med. Sys., Inc.*, 191 I. & N. Dec. 362 (Comm'r 1986); *Matter of Hughes*, 18 I. & N. Dec. 289 (Comm'r 1982).

First, USCIS concluded the evidence failed to establish Whitestar's ownership.

Initially, Whitestar claimed that it was related to Smadi as "an affiliate of the parent company." Dkt. No. 14-12 at 43 (AR at 1148). In the affidavit in support of the Form I-140 petition, Whitestar's Chairman, Anan Qadri, states that he owns 50% of Whitestar's shares and that Smadi owns the remaining 50%. *See id.* Whitestar also submitted two certificates, dated July 20, 2012, reflecting this distribution of shares. *See* Dkt. No. 14-2 at 81-82 (AR at 181-82); Dkt. No. 14-12 at 55-56 (AR at 1160-61). But there was conflicting evidence. Whitestar's 2014 tax return indicated that Mr. Qadri owns 100% of Whitestar's shares, which was inconsistent with the affidavit and shares certificates. *See* Dkt. No. 14-5 at 8 (AR at 430 (Form 1125-E regarding compensation of officers)).

USCIS noted this inconsistency in the NOID. Because of this inconsistency, USCIS determined that the evidence failed to establish the foreign entity – Smadi – has any ownership of the petitioner – Whitestar – and that, as a result, there could not be a qualifying relationship between Whitestar and Smadi. *See* Dkt. No. 14-1 at 16-17 (AR at 15-16). USCIS explained that, although it is possible to establish a qualifying relationship with 50-50 ownership in a joint venture-subsidiary relationship, Whitestar claims to be an affiliate, not a subsidiary. Thus, even if Whitestar had established that Smadi owns 50% of Whitestar's shares, it would not have established that Whitestar and Smadi were affiliates. *See id.* at 17 (AR at 16).

In response to the NOID, Whitestar submitted a new affidavit from Mr. Qadri. *See* Dkt. No. 14-1 at 4; Dkt. No. 14-4 at 46-53 (AR at 341-48) (new affidavit). In the new affidavit, Mr. Qadri claims that Whitestar is a 50-50 joint venture in which he

owns 50% of the shares and Smadi owns the remaining 50% of the shares, with each having equal control and veto power over Whitestar. *See* Dkt. No. 14-4 at 46 (AR at 341). He explains that, "[i]n my previous affidavit, I should have stated that Whitestar is 'a subsidiary of the parent company' rather than 'an affiliate of the parent company.' That was an error" and "I appreciate USCIS calling to my attention the error in Whitestar's tax returns… those tax returns should not say that I own 100% of Whitestar," and he represents that Whitestar has submitted amended tax returns to the IRS to correct those errors. *Id.*; *see also* Dkt. No. 14-4 at 54 – Dkt. No. 14-5 at 12 (AR at 349-434) (tax returns and amendments (Forms 1120, 1120X, 1125-E)); Dkt. No. 14-5 at 13-15 (AR at 435-57) (certified mail receipt).

"The petitioner must provide reliable evidence supporting the visa application." *Grinin v. Johnson*, 224 F. Supp. 3d 525, 530–31 (S.D. Tex. 2016). "[I]t is incumbent upon the petitioner to resolve [any] inconsistencies by independent objective evidence. Attempts to explain or reconcile [any] conflicting accounts, absent competent objective evidence pointing to where the truth, in fact, lies, will not suffice." *Id.* (quoting *Matter of Ho*, 19 I. & N. Dec. 582, 591 (BIA 1988)). "Doubt cast on any aspect of the petitioner's proof may, of course, lead to a reevaluation of the reliability and sufficiency of the remaining evidence offered in support of the visa petition." *Matter of Ho*, 19 I. & N. Dec. at 591.

USCIS may deny a petition if it determines the evidence is incomplete, inaccurate, or not credible. *See Madrasah Islamiah, Inc. v. DHS*, No. 12-cv-3492, 2015 WL 632090, at *10 (S.D. Tex. Feb. 23, 2015). Here, USCIS determined that the

additional evidence did not resolve the inconsistencies concerning ownership of Whitestar's shares. There was no independent evidence establishing that the certified mail receipt was for filing of the Form 1120X amendments or that the IRS certified the amended Form 1125-E regarding compensation of officers. *See* Dkt. No. 14-1 at 5 (AR at 4).

Whitestar argues that it was not given sufficient time to obtain IRS verification accepting the amended Forms 1120X and 1125-E. The NOID, in which the issue of whether a qualifying relationship existed was raised for the first time, is dated January 27, 2020. Whitestar's response was due by February 29, 2020, but Whitestar contends that it did not receive a copy of the NOID in the mail until February 5, 2020, giving it only 24 days to respond.

But the alleged inadequate response time does not make denial of the petition arbitrary and capricious. USCIS explained that "a petitioner must establish eligibility at the time of filing; a petition cannot be approved at a future date after the petitioner becomes eligible under a new set of facts," and "a petitioner may not make material changes to a petition that has already been filed in an effort to make an apparently deficient petition conform to [statutory] requirements." *Id.*; *see also* 8 C.F.R. 103.2(b)(1) ("An applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication."). USCIS concluded that, because of the inconsistencies regarding Whitestar's ownership, the evidence failed to establish that

the Smadi has any ownership of Whitestar and that, as a result, there cannot be any qualifying relationship between Whitestar and Smadi. *Id.*

Second, USCIS concluded that, because of these same inconsistencies, the evidence failed to establish that Whitestar was a subsidiary of Smadi, the foreign entity, instead of an affiliate. To establish that it was Smadi's affiliate or subsidiary, Whitestar was required to prove that it was owned and controlled either by the same parent or individual, or the same group of individuals, each owning and controlling approximately the same share or proportion of each entity. *See* 8 C.F.R. § 204.5(j)(2). Here, the evidence showed that Whitestar is a U.S. company, which is 100% owned by Mr. Qadri, according to federal tax returns that were initially submitted, or 50% owned by Mr. Qadri and 50% owned by Smadi, according to an affidavit and share certificate. This conflicting evidence failed to establish that Whitestar was created by two companies from different countries and, as a result, failed to establish the existence of a qualifying relationship. *See* 8 C.F.R. § 204.5(j)(3)(i)(C).

Third, USCIS concluded the evidence fails to establish ownership of Smadi, the foreign entity. To establish Smadi's ownership, Whitestar submitted:

- A copy of a "Trade Registration Certificate" issued by the Ministry of National Economy, Palestinian National Authority (Dkt. No. 14-2 at 93 (AR at 193));

- A copy of the professional license issued by the Ministry of Health, Nablus Municipality (Dkt. No. 14-2 at 75 (AR at 175));

- Letters from the Palestinian Income Tax Department (Dkt. No. 14-2 at 95, 99-100 (AR at 195, 199-200));

- Letters from business partners (Dkt. No. 14-2 at 94, 97-98 (AR at 194, 197-98)); and

- A letter from the Chamber of Commerce and Industry, Nablus (Dkt. No. 14-2 at 96 (AR at 196)).

The trade registration certificate indicates that Mr. Tareq Z. N. Smadi registered a company to trade agricultural materials with a capital of "40,000 JD." Dkt. No. 14-2 at 93 (AR at 193). But, as USCIS explained, it did not indicate the name of the entity registered or the name of the owner. Likewise, the professional license did not explain Smadi's ownership. *See id*. at 75 (AR at 175).

The letters from the Palestinian Income Tax Department state, in part, "Palestienian [sic] Income Tax admeded [sic] that Mr. Tariq Z. N. Smadi is one of the taxpayer [sic] and he is commeted [sic] in paying taxes." *Id*. at 95, 99-100 (AR at 195, 199-200). USCIS explained that individual tax liability does not show Mr. Smadi is the owner. *See* Dkt. No. 14-1 at 6 (AR at 5). USCIS also questioned the authenticity and credibility of the letters because of numerous misspellings. Other examples noted by USCIS were "to whome [sic] it conceren [sic]" and "This certificated [sic] according to his demand." Dkt. No. 14-2 at 95, 99 (AR at 195, 199). "USCIS may reject a fact stated in the petition if it does not believe it to be true." Dkt. No. 14-1 at 6 (AR at 5); *see also Systronics Corp. v. INS*, 153 F. Supp. 2d 7, 15 (D.D.C. 2001) ("[I]f the Attorney General fails to believe the facts stated in the petition are true, then he may reject it.").

The remaining letters attest that Mr. "Tareq" Z. N. Smadi is the owner of the foreign entity. *See* Dkt. No. 14-2 at 94, 96-98 (AR at 194, 196-98). USCIS explained that this form of testimonial was insufficient to establish ownership. *See Butts v.*

*Aurora Health Care, Inc.,* 387 F.3d 921, 925 (7th Cir. 2004) ("Self-serving statement in affidavits without factual support in the record carry no weight on summary judgment.") (emphasis omitted); *Matter of Ho,* 19 I.&N. Dec. at 591-92 ("[I]t is incumbent on the petitioner to resolve any inconsistencies in the record by independent objective evidence; any attempts to explain or reconcile such inconsistencies, absent competent objective evidence pointing to where the truth lies, will not suffice.").

Based on these deficiencies, USCIS determined that the record did not establish the existence of a qualifying relationship. *See* Dkt. No. 14-1 at 6. And, for the reasons explained above, USCIS's denial of the Form I-140 petition because Whitestar failed to establish a qualifying relationship was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

III.   USCIS did not err by denying the I-140 Petition on the basis that Whitestar <u>failed to establish the United States position qualified as a managerial.</u>

USCIS denied the Form I-140 petition because Whitestar failed to establish that Mr. Kamal would be performing primarily in a managerial capacity in the United States. *See* Dkt. No. 14-1 at 6-11 (AR at 5-10).

For an immigrant employee to obtain a multinational executive or manager visa, the petitioner must establish that the beneficiary's duties will be primarily executive or managerial. A first line supervisor will not qualify as an international manager unless the employees supervised are professional. *See* 8 U.S.C. § 101(a)(44)(A). Often it is necessary to consider other factors, including the petitioner's organizational hierarchy and its staffing, as these factors are accurate indicators of a

company's ability to relieve the beneficiary from having to focus time primarily on the performance of non-qualifying operational tasks. *See, e.g.*, *Fedin Bros. Co. Ltd. v. Sava*, 724 F. Supp. 1103, 1108 (E.D.N.Y. 1989).

"Managerial capacity" and "executive capacity" are defined terms. *See* 8 U.S.C. § 1101 (a)(44)(A), (B); 8 C.F.R. 214.2(l)(1)(ii). The term "managerial capacity" means an assignment within an organization in which the employee primarily

> (i) manages the organization, or a department, subdivision, function, or component of the organization;
> (ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;
> (iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and
> (iv) exercise discretion over the day-to-day operations of the activity or function for which the employee has authority.

8 U.S.C. § 1101 (a)(44)(A). The term "executive capacity" means an assignment within an organization in which the employee primarily

> (i) directs the management of the organization or a major component or function of the organization;
> (ii) establishes the goals and policies of the organization, component, or function;
> (iii) exercises wide latitude in discretionary decision-making; and
> (iv) receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

8 U.S.C. § 1101 (a)(44)(B).

The definitions of executive and managerial capacity have two parts. First, the petitioner must show that the beneficiary performs the high-level responsibilities

that are specified in the definitions. Second, the petitioner must prove that the beneficiary primarily performs these specified responsibilities and does not spend a majority of his or her time on day-to-day functions. *See Champion World, Inc. v. INS,* 940 F.2d 1533, at *1 (9th Cir. 1991). Also, specifics are clearly an important indication of whether a beneficiary's duties are primarily executive or managerial in nature – otherwise meeting the definitions would simply be a matter of reiterating the regulations. *See Fedin Bros.*, 724 F. Supp. at 1108. Reciting the beneficiary's vague job responsibilities or broadly cast business objective is insufficient: the regulations require a detailed description of the beneficiary's daily job duties. The actual duties themselves will reveal the true nature of the employment. *See id.*; *see also* Dkt. No. 14-1 at 7-8 (AR at 8-9).

Whitestar claims that Mr. Kamal will be employed as a general manager. In Mr. Qadri's initial affidavit submitted in support of the Form I-140 petition, he described Mr. Kamal's job duties for the position offered in the United States:

A. Mr. Kamal will manage the organization.

> As the General Manager, Mr. Kamal will be responsible for directing and managing the organization and the development of the business in a managerial capacity. He will direct the management of the organization by interviewing and hiring staff for the company. He will also be responsible for establishing the goals and policies of to the company.

B. Mr. Kamal will manage an essential function within the organization.

> In Mr. Kamal's role as General Manager, he will manage various parts of the business. He will be responsible but not limited to managing the sales, distribution, accounting, and purchasing functions of the company.

C. Mr. Kamal will have the authority to hire and fire or recommend those as well as other personnel actions.

In Mr. Kamal's role as General Manager, he will have complete authority to hire and fire employees. He will be responsible for interviewing other employees that may serve in supervisory, professional, or managerial functions.

D. Mr. Kamal will exercise discretion over the day-to-day operations of the company.

As the General Manager, Mr. Kamal will exercise discretion over the day-to-day operations of the company. He will implement goals and be responsible for establishing goals and policies of the company.

The breakdown of his responsibilities as General Manager is below:

50%    Set strategic plans to ensure the company's profitablility.

50%    Hire employees to implement his set plans, monitor their performance, evaluate their performance, and ensure the company is efficient.

Dkt. No. 14-12 at 45 (AR at 1150). Whitestar also submitted its 2013 organizational chart and a list of the names and positions of its employees. *See* Dkt. No.14-8 at 72 (AR at 763); Dkt. No. 14-16 at 67 (AR at 1572).

USCIS determined that Mr. Kamal's job description was too generic and failed to describe Mr. Kamal's specific daily duties. *See id*. at 8 (AR at 9). In the RFE, it asked for specifics that would establish that Mr. Kamal would perform high-level responsibilities. *See id*. at 37 (AR at 36).

In response, Whitestar submitted a new, lengthier, undated, and unsigned statement of Mr. Kamal's job description, *see* Dkt. No. 14-8 at 68 (AR at 759); Dkt. No. 14-16 at 68 (1573), which USCIS determined "is still generic," *see* Dkt. No. 14-1

at 8 (AR at 7). Whitestar did not explain what "establish[ing] the goals and objectives of the organization" or "defin[ing] the product sales & marketing plan, and supervising sales and distribution of a product" involve as they relate to Mr. Kamal's daily tasks. *Id.* Nor did Whitestar explain what "control[ling] cash and working capital effectively" involves. *Id.* "Absent specific information, general descriptions of business-related tasks are insufficient to comply with the implementing regulations and do not demonstrate that a beneficiary's duties will be primarily managerial, as opposed to non-managerial." *Khamisiani v. Holder*, Civil Action No. H-10-0728, 2011 WL 1232906, at *7 (S.D. Tex. Mar. 31, 2011); *see also* 8 C.F.R. § 204.5(j)(5) (requiring a detailed statement that "clearly describe[s] the duties to be performed by the alien" in a managerial or executive capacity").

The statement also indicates that Mr. Kamal's "daily duties have changed." *See* Dkt. No. (AR at 792). As discussed above, the petitioner must establish the beneficiary's eligibility at the time of filing, and a petition cannot be approved at a future date after a beneficiary becomes eligible under a new set of facts. Thus, USCIS concluded that the job description submitted in response to the RFE cannot be considered in determining whether the position offered to Mr. Kamal is primarily managerial in nature. *See id.* at14-1 at 8 (AR at 7).

But, even if the new job description could have been considered, USCIS identified other deficiencies. *See id.* at 8-11 (AR at 7-10).

 In Mr. Qadri's affidavit submitted in response to the NOID, he states that the original job description "was ... prepared in 2013 to demonstrate the managerial

nature of the position at that time." Dkt. No. 14-4 at 46-53 (AR at 341-48). USCIS did not find this explanation to be credible because the initial affidavit, which contained the offered position's description, was signed on August 9, 2016 and not in 2013. *See* Dkt. No. 14-1 at 9 (AR at 7).

Mr. Qadri also explained that the job duties submitted in response to the RFE issued on January 24, 2017 reflected Mr. Kamal's duties as of that date. See Dkt. No. 14-4 at 47 (AR at 342). And Mr. Qadri stated that, "[s]ince there has been so much confusion around this topic, I will now provide a current description of what Mr. Kamal's [beneficiary] managerial duties, responsibilities and tasks will be as a General Manager." *Id.* Again, USCIS could not consider those job descriptions: "[b]ased on the petitioner's chairman's own admission, none of the beneficiary's job duties provided in support of this petition, NOID's response included, reflects the beneficiary's actual job duties as of the priority date of August 15, 2016." *See* Dkt. No. 14-1 at 8-9 (AR at 7-8).

USCIS also found the new job descriptions to be too generic, contradictory, and not credible. *See id.* at 9 (AR at 8). For instance, in his most recent affidavit, Mr. Qadri stated that Mr. Kamal would be "[p]lanning and expansion of operation, which includes opening new stores and finding new markets/customers through research analysis of products, companies, pricing, and requirements for each different market/customer base which varies from store to store by location and population demographics." Dkt. No. 14-4 at 48-49 (AR at 343-44). Mr. Qadri stated that these would be daily duties. He also stated that Mr. Kamal would be "[m]anaging

performance of staff; reviewing quarterly reports on employees' performance to determine whether promotions, new hirings, firings, restructuring of job duties is required; and ensuring the organization is following proper quality control procedures to maintain the highest product standards possible, ensure customer retention, and increase efficiency." *Id.* at 49 (AR at 344). USCIS noted that Whitestar did not reconcile the contradiction between daily and quarterly duties and that it also failed to establish how much time Mr. Kamal would specifically spend on hirings and firings given Whitestar's small size. *See* Dkt. No. 14-1 at 9 (AR at 8). Nor did Whitestar explain what Mr. Kamal would specifically do in "[r]eviewing marketing strategies and advertising, and monitoring distribution channels, to ensure efficiency and lower storing costs," Dkt. No. 14-4 at 49 (AR at 344), or provide examples with evidence of Whitestar's advertisements, *see* Dkt. No. 14-1 at 9 (AR at 8). Based on these deficiencies, USCIS could not conclude that Mr. Kamal would be performing primarily managerial duties. *See id.*

USCIS also addressed whether the broad duties attributed to Mr. Kamal qualify as managerial in nature. This determination depends in large part on whether Whitestar established that it would have sufficient subordinate staff for Mr. Kamal to supervise and perform the day-to-day activities Mr. Kamal is claimed to manage. *See id.* at 9-10 (AR at 8-9). It concluded that Whitestar has not adequately documented its staffing and structure or shown its ability to relieve Mr. Kamal from significant involvement in the operational tasks required to operate its business.

Absent this evidence, USCIS could not determine that Mr. Kamal's primary job duties would be managerial. *Id.*

Whitestar's 2015 Employer's Quarterly Federal Tax Return indicated that the company employed seven workers in the first quarter, twelve workers in the second quarter, thirteen workers in the third quarter, and eleven workers in the fourth quarter. *See* Dkt. No. 14-5 at 19-26 (AR at 540-47). Whitestar did not submit it 2016 Employer's Quarterly Federal Tax Return, *see* Dkt. No. 14-1 at 10 (AR at 9), but its 2016 W-2 Forms indicated that it employed fifteen workers, *see* Dkt. No. 14-51-66 (AR at 841-56). Whitestar did not indicate whether it employed these workers on a full-time basis or whether any of these employees is a professional. USCIS questioned whether any of the employees were full-time or professional because of the low wages shown on the W-2s. Nine of the eleven employees were paid less than $20,000 that year. *See* Dkt. No. 14-1 at 10 (AR at 9).

Whitestar's 2013 organization chart listed ten workers with an operation manager and a sales manager reporting directly to Mr. Kamal. *See* Dkt. No. 14-8 at 52 (AR at 743). It also included five other managers (accounting, warehouse, and three store managers), a sales representative, and a warehouse clerk. *See id.* Whitestar's second, undated organizational chart included three additional sales representatives, an accountant, and the position of president. *See id.* at 97 (AR at 788).

The statutory definition of "managerial capacity" allows for both "personnel managers" and "function managers." *See* 8 U.S.C. § 101(a)(44)(A)(i) and (ii).

Whitestar did not claim that Mr. Kamal will be employed as a functional manager; instead, the organizational charts appear to indicate that Mr. Kamal would be employed as a personnel manager. *See* Dkt. No. 14-1 at 10 (AR at 9). Personnel managers are required to primarily supervise and control the work other supervisory, professional, or managerial employees. *See* 8 U.S.C. § 101(a)(44)(A)(iv); 8 C.F.R. § 214.2(1)(l)(ii)(B)(2).

USCIS determined that Whitestar failed to establish that any of Mr. Kamal's subordinates is a professional. And, even with the subordinates that Whitestar did describe, some of their generic task percentages added up to 140% and not 100%. *See* Dkt. No. 14-8 at 68-69 (AR at 759-60). The initial organizational chart indicates that Whitestar employees more than 80% (9 out of 11) in its workforce in management, and the second organizational chart indicates that 60% (9 out of 15) of its workers are in management positions. *See id.* at 14-1 at 10 (AR at 9). Accordingly, USCIS determined that neither the organizational charts nor the staffing levels were credible. *See id.*

Based on these deficiencies, USCIS determined that it could not conclude Mr. Kamal would be performing primarily in a managerial capacity in the United States. And, for the reasons explained above, this determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

IV.    USCIS did not err by denying the I-140 Petition on the basis that Whitestar failed to establish the position abroad qualified as managerial.

28

USCIS denied the Form I-140 petition because Whitestar failed to establish that Mr. Kamal was employed abroad as a manager for Smadi. *See* Dkt. No. 14-1 at 11-14 (AR at 10-13).

For an immigrant employee to obtain a multinational executive or manager visa, the petitioner must establish that the beneficiary was employed as a manager or executive for at least one year within three years preceding his admission into the United States. *See* 8 U.S.C. § 101(a)(44)(A).

In Whitestar's initial affidavit, Mr. Qadri indicates that Mr. Kamal was employed as an administrative and financial manager for Smadi from July 2006 to July 2013. See Dkt. No. 14-2 at 71 (AR at 171). He also described Mr. Kamal's job duties with Smadi:

A. Mr. Kamal managed a function and component of the organization.

Mr. Kamal served as the Administrative and Financial Manager for Smadi in Palestine. He was responsible for managing the finances and administration of the company. He also implemented the strategic plans set by the General Manager. He was also responsible for hiring staff to implement discussed strategic plans. He trained staff to complete assigned duties as applicable. He consistently evaluated the staff's work and made suggestions for improvement. He managed the day to day operations throughout the company. He analyzed reports from sales, purchasing, and accounting departments of the company.

B. Mr. Kamal supervised and controlled the work of other managerial employees and managed an essential function of the organization.

As discussed above, as the Administrative and Financial Manager Mr. Kamal was responsible for supervising the staff of the company, which includes supervisory, professional, and managerial employees from multiple departments, including the sales, purchasing, and accounting departments.

C. Mr. Kamal had the authority to hire and fire or recommend employees as well as other personnel actions.

As the Administrative and Financial Manager, Mr. Kamal had the authority to hire and fire the employees over which he had supervisory responsibilities. Mr. Kamal also supervised and controlled the work of members in multiple departments, including sales, purchasing, and accounting. He also had the authority to recommend employees for raises and/or promotions.

D. Mr. Kamal exercised discretion over the day-to-day operations of the activity or function for which he had authority.

Mr. Kamal continually exercised discretion over the day to day operations of the company. He implemented goals created by the President and the General Manager. He was responsible for increasing sales volume and for creating and implementing strategies to improve the performance of various departments. Mr. Kamal also collected feedback from the departments and analyzed the information to improve the company. Mr. Kamal also reported to higher management regarding his analysis and findings upon conferring with the company's different departments.

The breakdown of Mr. Kamal's responsibilities as Administrative and Financial Manager are below:

30%    Implemented strategic plans set by the General Manager

30%    Trained employees to complete daily and weekly assignments/duties and evaluated their performance.

40%    Monitored the day to day operations and analyzed reports from multiple departments.

*Id.* at 71-72 (AR at 171-72). USCIS concluded that these job descriptions were "simply a repetition of the regulation" and did not include the required specificity. *See* Dkt. No. 14-1 at 13 (AR at 12).

In the RFE, USCIS notified Whitestar that Mr. Kamal's claimed foreign experience was not credible because of the discrepancy between his claimed

experience in this proceeding and the work history that he provided on his nonimmigrant visa application dated August 23, 2011. *See id.* In the affidavit in support of the Form I-140 petition, Whitestar claimed that Mr. Kamal "was employed continuously and without interruption by Smadi from July 2006 to January 2013…as the Administrative and Financial Manager for Smadi in Palestine" to show that Mr. Kamal acted in a qualifying capacity as a multinational manager abroad. Dkt. No. 14-1 at 36 (AR at 35); Dkt. No. 14-2 at 71 (AR at 171). But, on his nonimmigrant visa application, Mr. Kamal gave his occupation as a lawyer for Jawal Co. *See* Dkt. No. 14-1 at 13 (AR at 12). There is no indication on the application that Mr. Kamal was ever employed by Smadi or as an administrative or financial manager. In fact, Mr. Kamal answered "no" to the question "[w]ere you previously employed?" on the nonimmigrant visa application. *Id.*

In response, Whitestar submitted an affidavit from Mr. Kamal in which he stated that he "provided legal representation to Jawwal [sic] Co. as a lawyer for debt collection between 2004 and 2012" and that it did not interfere with his employment at Smadi as its administrative and financial manager. Dkt. No. 14-8 at 88 (AR at 779). Mr. Kamal explained that he only included his position as a lawyer with Jawal Co. on the nonimmigrant visa application "because Jawwal Co. … is much more well-known than Smadi." *Id.* Whitestar also submitted additional letters attesting to Mr. Kamal's experience at both employers. *See id.* (AR at 781-85).

In response to the NOID, Whitestar submitted another affidavit from Mr. Kamal, *see* Dkt. No. 14-6 at 27-29 (AR at 548-50), a statement from Mr. Smadi, *see*

*id*. at 30 (AR at 551), and Mr. Kamal's pay vouchers, *see id*. at 32-61 (AR at 553-82). In his new affidavit, Mr. Kamal blames the discrepancy concerning his prior employment on Aramex Co., the company with which he contracted to prepare his prior visa application. *See id*. at 28 (AR at 549). He states that he provided the names of both employers (Smadi and Jawal Co.) but that Aramax Co.'s representative chose to list only Jawal Co. on his application. *See id*. (AR at 549-50). USCIS determined that this explanation was not credible. See Dkt. No. 14-1 at 13 (AR at 12). Mr. Kamal attested to the accuracy of the information on the application, and USCIS was not persuaded that he would do so without reading it. *See id*. USCIS concluded that it could not conclude Mr. Kamal was employed by Smadi. *See id*.

USCIS determined that the evidence does not establish Smadi employed Mr. Kamal in a qualifying capacity as a manager or executive. And, for the reasons explained above, this determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

V.    Conclusion

Where USCIS denies an immigrant petition on multiple grounds, courts must affirm that decision as long as any one of those grounds is valid. *See, e.g., Doe v. McAleenan*, 929 F.3d 478, 485 (7th Cir. 2019) ("[B]ecause USCIS's determination was based on two independent and alternative grounds, we would have to find error in both determinations in order to grant relief to [plaintiff]."). Thus, "if the [agency] denies a petition based on multiple grounds, the plaintiff will succeed with a challenge only if the plaintiff shows that the [agency] abused its discretion with

respect to all of the enumerated grounds." *Khamisiani,* 2011 WL 1232906, at *8 (citing *Spencer Enters. v. United States*, 229 F. Supp. 2d 1025, 1037 (E.D. Cal. 2001)).

USCIS denied Whitestar's petition for a permanent resident visa on behalf of beneficiary Morad Talal Kamal on three grounds. It determined that

- Whitestar did not establish a qualifying relationship with the foreign entity.

- Whitestar did not establish that the beneficiary will be employed primarily in a managerial position; and

- Whitestar did not establish that the beneficiary was employed in a qualifying position for the foreign organization.

Dkt. No. 14-1 at 14 (AR at 13.).

USCIS's denial of the petition was valid on all three grounds. Alternatively, if the Court were to find that USCIS abused its discretion by did not giving Whitestar enough time to respond to the deficiencies raised in the NOID concerning Whitestar's relationship with Smadi, USCIS's denial based on the other two grounds was valid and Whitestar has had two opportunities address the issues raised by USCIS in the RFE and NOID concerning Mr. Kamal's employment. Accordingly, the Court should deny Whitestar's motion for summary judgment, grant Defendants' cross-motion for summary judgment, and affirm USCIS's decision denying the I-140 Petition.

### Recommendation

The Court should deny Plaintiff's Motion for Summary Judgment [Dkt. No. 16], grant Defendants' Cross-Motion for Summary Judgment [Dkt. No. 18], and affirm USCIS's April 3, 2020 Decision denying the Form I-140 Immigrant Petition for

Alien Worker submitted by Whitestar Distributors, Inc. on behalf of beneficiary Morad Talal Kamal.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: September 29, 2020

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE